COREY TARVIN,                          )
                                       )
        Petitioner,            )
v.                                     )          No. 1:14-CV-252-CLC-SKL
                                       )
STATE OF TENNESSEE and DEBRA K.        )
JOHNSON,                               )
                                       )
        Respondents.           )

## MEMORANDUM OPINION

This is a pro se prisoner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 [Doc. 1]. Respondents filed a response in opposition thereto, as well as a copy of the state record [Docs. 18 and 19]. For the reasons set forth below, Petitioner's § 2254 petition [Doc. 1] will be **DENIED** and this action will be **DISMISSED**.

## I.    PROCEDURAL HISTORY

A Hamilton County jury found Petitioner guilty of one count of first-degree murder [State Court Record p. 16]. Petitioner appealed and the Tennessee Court of Criminal Appeals ("TCCA") affirmed the conviction. *State v. Tarvin*, No. E2007-01927-CCA-R3-CD, 2009 WL 311565, at *6 (Tenn. Crim. App. Feb. 6, 2009). Petitioner filed a petition for post-conviction relief, which the post-conviction court denied [State Court Record p. 824–837]. The TCCA affirmed this denial. *Tarvin v. State*, No. E2012-01211-CCA-R3-PC, 2014 WL 259675, at *22 (Tenn. Crim. App. Jan. 22, 2014), *perm. app. denied* (Tenn. Feb. 12, 2014).

## II.    BACKGROUND

The following factual background is taken from the TCCA's opinion on direct appeal of Petitioner's conviction:

At the defendant's May 22–25, 2007, trial, Officer Matthew Talley of the East Ridge Police Department testified that on June 15, 2005, . . . at 12:07 a.m., he received a call that there was an apparent gunshot victim lying in the middle of the street in the 600 block of North Holly. He stated that when he and his fellow officers responded to that location, they saw a large crowd in the middle of the street and the victim lying in the street partially on his side with his face down. He testified that, according to the report he had prepared, witnesses at the scene reported that an unknown suspect had fled the area in a blue Blazer. On cross-examination, he acknowledged that his report indicated that witnesses also stated that the victim and the defendant had been arguing before the shooting.

Detective Gregory Mardis of the Chattanooga Police Department testified that he was an investigator with the crime scene unit and responded to the scene of the shooting at 1:19 a.m. on June 15, 2005. He stated that when he arrived, another investigator related that the defendant and the victim had gotten into an argument, that a fight had ensued, and that the defendant had retrieved a gun from his vehicle, shot the victim, and fled the scene. Detective Mardis identified a number of items that were subsequently admitted into evidence, including crime scene photographs that showed where the victim's blood had "puddled up on the street[.]" He stated that he searched the area but was unable to locate any weapon.

Lottie Stamper, who said she lived at 609 North Holly Street and had known the defendant for years, testified that on the night of the shooting, the defendant and a number of other individuals were "hanging out" in the vicinity of Larry Harper's duplex located at 618 North Holly. She said that another neighborhood resident known as Greg or "Fat Boy" spoke to the defendant's girlfriend and that the defendant became angry, telling him that he could not be "hollering at [his] bitch like that." She stated that the two men exchanged words and then began fighting. She testified that two other men, Ladarius and Cornelius, became involved and that the victim, who was visiting his aunt at 614 North Holly, walked down the street to attempt to break up the fight. She said the victim was unsuccessful, walked back to his aunt's house, and went inside. She testified that the victim then came out of his aunt's house and walked to his car, talking about his "Game Boy." She stated that the defendant and

the other men were no longer fighting at that time but were still down the street at Harper's house arguing.

Stamper described the shooting:

[The victim] went in the car, he was bent over in the car. As he came out [of] the car, we was sitting on the corner. By that time, [the defendant] came out of [Harper's] house and somebody said "Gun!" Everybody . . . left the street so fast, and . . . me and one of my neighbors . . . said at the same time, "Somebody going to get shot." By that time, [the victim] had, you know, one knee in the car . . . . And he's coming out. As he turned, [the defendant] was coming up the street with the gun, fired the shot, [the victim] fell, everybody had scattered.

Stamper further testified as follows. She went to the victim and began applying pressure to his wound. As she did so, he kept asking what he had done and why had he been shot. She was still with the victim when the defendant drove down the street toward them in a sports utility vehicle, and she overheard him say, "I'm going to run over that motherf———." She put herself in front of the victim and told the defendant not to do it. He paused a minute, said, "I should have ran over that motherf———," and then drove off.

Stamper testified that she did not tell the police that the victim was involved in the argument or the fight and suggested that either the police officer who took her statement misunderstood her or that she misspoke and said the victim's name when she meant to say Greg. She stated that she saw the defendant go to his vehicle at some point between the fight and the shooting but that she did not see him retrieve a gun from the vehicle. She said the defendant was the only one she saw with a gun that night. Finally, she testified that although the defendant had grown up with her children and been "just like a son," she felt obligated to testify against him because she had witnessed him kill the victim.

On cross-examination, defense counsel played a portion of Stamper's tape-recorded statement to police, made within a few hours of the shooting. Stamper acknowledged that she said in the statement that the victim and the defendant were arguing over a girl and got into a fight and that the victim's cousins attempted to break up the fight. She further acknowledged that she never said anything

in her statement about the victim's having gone to retrieve something from his car, instead telling the police officer that the victim was walking away from the fight when he was shot. She explained the discrepancies by stating that she might have said anything in the immediate hours after the shooting and insisted that the account she provided on direct examination was accurate. She testified, "Like I said, when the boy got shot, I could have said anything. I don't know. I hear what's on there and I understand what's on there, but I'm telling you what happened, the way it happened."

The victim's cousin, Antoin Edwards, testified that he was twelve years old at the time of the shooting and that he had been playing video games that night with the victim at his aunt's house, where two other cousins, Ladarius and Cornelius, were present. He said that he heard voices outside and that the victim and Cornelius left the house. He stated that the voices got louder and that he looked out the window and saw the defendant shoot the victim in the back. He estimated that the men were within a foot of each other when the shot was fired and said that he did not see anything that preceded the shooting.

Homicide Detective James Tate of the Chattanooga Police Department testified that the defendant was arrested at approximately 11:00 a.m. on June 16, 2005, and brought to the "service center" where he and Detective Miller questioned him about the crime. He identified the defendant's waiver of rights form and his tape-recorded statement, which were subsequently admitted into evidence. In the statement, played for the jury, the defendant said that he and Gregory Scott got into a fight after Scott "disrespected" the defendant's girlfriend. He said that after three or four minutes of one-on-one fighting, two to four other men jumped in, ganged up on him, and tore off his shirt. The defendant stated that he told the men the fight was over and that they broke loose, letting him go. He said that he was walking away when he noticed a second group of people headed down the street toward him. He stated that he "made up [his] mind," went to the porch of a duplex, retrieved a hidden gun, turned around, and fired at the victim, who had been following him and who turned and began to run away when he saw that the defendant had a gun. The defendant stated that he had to "rack" the gun in order to fire the shot. He said that he

intended to commit an aggravated assault on the victim and did not mean to kill him.

Detective Tate testified that the gun came from the porch of 618 North Holly Street, which was more than twenty yards from where the victim's body was found. He said the defendant had no visible cuts or abrasions on his face or hands during the interview and did not appear to have been in a recent fight. He testified that the defendant never identified the victim as one of the major participants in the altercation. On cross-examination, he acknowledged that the shirt identified as the one the defendant had been wearing on the night of the altercation was torn.

Frank King, Jr., M.D., the Hamilton County medical examiner who performed the autopsy of the victim's body, testified that the cause of death was a gunshot wound in which the bullet entered the victim's body at the left lower back, grazed against the spine, tore the aorta, went through the bowel, and exited at the right anterior abdomen. He classified it as a distant gunshot wound, fired from a distance of two feet or greater, and he said that it entered the body at 45.5 inches above the heel and exited at 44.5 inches above the heel, which meant that it descended one inch from point of entry to point of exit with the body in "anatomic position." He stated that he observed no fresh injuries to the victim's head, hands, or legs other than those caused by the emergency medical care he received after the gunshot. He testified that he found two fresh abrasions on the back right shoulder, which could be consistent with the victim's having fallen to the pavement after being shot. During his testimony, Dr. King identified several autopsy photographs, which were admitted into evidence and published to the jury. On cross-examination, he acknowledged that the victim's hands had been washed in the emergency room and that he had no way of knowing the exact position of the victim's body, head, or limbs at the time he was shot other than that his lower left back was facing the direction of fire.

The defendant elected not to testify and presented no witnesses in his defense.

*State v. Tarvin*, 2009 WL at *1–4.

The following factual background is taken from the TCCA's opinion on appeal of Petitioner's petition for post-conviction relief:

> At the post-conviction hearing, counsel testified that he did not subpoena witnesses for the trial, although the Petitioner provided a list of four or five names the Petitioner thought had beneficial information. He said he asked the Petitioner for contact information, but the Petitioner was unable to provide addresses and working telephone numbers. He said he attempted to find the people on the list by going to Holly Street where the killing occurred. He said he and his paralegal tried to find the people on the list by canvassing the neighborhood and talking to people. He denied talking to anyone on the Petitioner's list and said nobody admitted knowing any of them. He said that they were unsuccessful in obtaining contact information for the people on the list and that he did not subpoena them because he could not find them. He said that he asked the Petitioner to identify other people who might provide information about how to find the people on the list but that counsel was still unable to find them.
>
> Counsel testified that he did not have an investigator or request the court to provide funds for an investigator. He said the Petitioner's case was pending at a time when he was responsible for the investigation. He denied that an investigator would have located the people on the list.
>
> Counsel testified that recordings of the Defendant's and the witnesses' statements to the police were provided in the discovery package, and he agreed a recording of Amanda Wynn's statement was included. When asked if he went to the address provided by Ms. Wynn in her statement to the police, he said he pursued any information that might have helped locate the witnesses. He said that in the neighborhood where the shooting occurred, it was common for people to hide because they did not want to participate as witnesses or discuss the case. He said that the difficulty in locating witnesses did not mean he did not look for them and that he was not shocked when he did not find them.
>
> Counsel testified that he did not know if he went to 2305 Barley Street. When he was told Ms. Wynn lived there, counsel said, he would have tried to locate the address. He said that he would have

gone to where the address should have been but that he was unsure if it was a "specific address." He said it was common to be unable to find a house at the address provided by a witness. He said that although he was unsure if a house was located at 2305 Barley Street, he went to the area looking for the address.

Counsel testified that he twice discussed with the Petitioner his inability to locate the people on the list and that they discussed his inability to find the people "within a reasonable proximity of the time." He said that his inability to locate them was not the reason he chose not to present a self-defense theory. He said he discussed with the Petitioner his decision not to argue self-defense at the trial. He said he explained to the Petitioner that he could be convicted of first degree murder, second degree murder, or manslaughter. He explained the elements of each offense and the likelihood of conviction and told the Petitioner that he believed the Petitioner was most likely to be convicted of second degree murder, although the jury convicted the Petitioner of first degree murder. Counsel stated that the Petitioner did not want to accept any plea offer that would result in a nineteen-year prison sentence. He said the Petitioner stated, "If I'm going to get that time, they're going to have to give it to me. I'm not going to take it." He believed the Petitioner thought the worst possible outcome was a voluntary manslaughter conviction and a nineteen-year sentence and said he attempted to explain to the Petitioner that "he had a lot of exposure." He said the Petitioner disagreed.

 Counsel testified that he discussed with the Petitioner whether the Petitioner should testify at the trial. He denied the theory of the case was self-defense and said the Petitioner told him that he was involved in a fight with a group of people but left the scene, returned with a weapon, and shot the victim. He said this was consistent with the Petitioner's statement to the police, which was played for the jury. He said the Petitioner's leaving the scene after the fight prevented a self-defense theory. He said that in his opinion, it was unwise for the Petitioner to testify. He agreed the Petitioner referred to multiple fights in his statement to the police but said the Petitioner discussed "breaking away" from a fight and obtaining a weapon, preventing a self-defense theory. He agreed that the Petitioner's baseball jersey was torn during the fight and said that the tear was significant because the material was strong and durable. He said he

used this evidence, in part, to show the Petitioner's state of mind at the time of the shooting and that the Petitioner was not operating with a "clear head" or premeditation. He said that he did not request a self-defense jury instruction because the facts did not support it and because self-defense was not the trial strategy.

Counsel testified that he did not recall if the box cutter found at the scene was introduced at the trial. He said it was difficult to link the box cutter to someone involved in the fight who used it against the Petitioner. He did not recall questioning before the trial the police officer who testified about the box cutter. He denied that the box cutter was analyzed for fingerprints and said he did not address the failure to have it analyzed at the trial because he could not "place the box cutter in any particular person's hands."

Counsel testified that they discussed the Petitioner's testifying at the trial on "a number of occasions" before the trial and after the State's case-in-chief. He advised the Petitioner not to testify and said he always discussed with his clients that counsel made certain decisions during the trial and that the defendant made certain decisions. He said he explained that the trial strategy of focusing on the Petitioner's state of mind rather than arguing self-defense was counsel's decision and that the decision to accept a plea offer and whether to testify at the trial belonged to the Petitioner. He said the Petitioner understood that he thought the Petitioner should accept a plea offer and that he did not recommend the Petitioner testify at the trial. He said the Petitioner understood that it was his decision to testify and that he could testify if he disagreed with counsel's recommendation. Counsel believed the Petitioner's testimony would have harmed the case because the Petitioner risked having his criminal history introduced at the trial. He said that the Petitioner knew the defense was not calling any witnesses when he made his decision not to testify.

Counsel testified that aspects of the Petitioner's statement to the police were not "fleshed out as perhaps they could have been if he testified." He said, though, that having a witness testify about one favorable topic did not justify presenting the witness at the risk of having numerous unfavorable topics addressed on cross-examination. He said that the Petitioner could have "fleshed out some things" had he testified but that his testimony would not have been materially different from his statement to the police. He said,

too, that cross-examination regarding the Petitioner's criminal history would have "overshadowed" any favorable testimony regarding the events leading to the shooting. He denied the Petitioner told him that after he obtained the gun, the victim stood behind him and two other people stood in front of him. He did not recall whether Ms. Wynn testified similarly at the trial. He recalled that the victim stood behind the Petitioner and that the Petitioner turned and shot the victim in the back, but he did not recall two men standing behind the Petitioner.

Counsel testified that he knew about the Petitioner's eye condition, macular degeneration, and that evidence of the condition was not introduced at the trial. He agreed his trial strategy was to obtain a conviction for voluntary manslaughter but denied that the condition would have been helpful. He said the testimony showed that the Petitioner thought someone was coming toward him, that the Petitioner fired the gun, and that the victim was shot in the back. He said that there "were issues" about the distance between the victim and the Petitioner and that testimony showed the Petitioner was not able to identify clearly whom he shot. Counsel did not think it mattered that the Petitioner had macular degeneration because the testimony showed that the Petitioner "was just shooting at a form, an object that he saw[.]" He denied that the Petitioner's eye condition might explain why the Petitioner did not know if he shot someone who was facing him or had their back to him.

Counsel testified that he recalled cross-examining Lottie Stamper but did not recall asking about her two misdemeanor theft convictions that occurred within ten years of the trial. He recalled that Ms. Stamper lived on the street where the shooting occurred and that she held the victim in her arms after he was shot. He said that although he did not recall if he asked Ms. Stamper about the convictions, he did not think the convictions would have changed the jurors' view of her testimony given the emotional nature of her testimony. He agreed Ms. Stamper provided a statement to the police that differed from her testimony. He said he highlighted the discrepancies during cross-examination by playing the relevant portions of her recorded statement to the police. He denied playing her entire statement. He agreed Ms. Stamper testified that the Petitioner stated twice he was going to "run this MFer over." He did not know why he did not object but said that his usual practice

was not to draw attention to statements of that nature because the judge might overrule an objection. He recalled thinking Ms. Stamper's testimony was highly emotional and dishonest.

Counsel testified that Ms. Stamper stated at the trial that the victim only attempted to stop the fight and that she found the victim's gunshot wound by pulling up the victim's shirt. He agreed Ms. Stamper said in her statement to the police that the victim "took off his shirt before he . . . began to fight." He agreed he did not address the inconsistency at the trial and said he did not think highlighting the inconsistent statement would have changed the jury's verdict because the victim was shot regardless of whether he wore his shirt at the time. He said he highlighted the consistencies that were most relevant to the theory of the case. He recalled that Ms. Stamper was an uncontrollable witness who said what she wanted to say and that he attempted to craft his questions carefully to prevent her from "going off the tracks." He did not want to object and hear the trial judge say, "You asked the question."

Counsel testified that he did not request special jury instructions regarding witness credibility and said the standard instruction was given. He said he reviewed the pattern jury instructions before the trial and determined which instructions he needed to request. He did not recall asking for a special instruction regarding witnesses convicted of crimes of dishonesty but said even if the jury discredited Ms. Stamper's testimony in its entirety, the outcome of the trial would have been the same because of the Petitioner's statement to the police. He agreed, though, that Ms. Stamper was the only witness who testified that the Petitioner said, "I should run that Mfer over." He agreed that Ms. Stamper testified that she either got in front of the car or protected the victim with her body and that the Petitioner said he should run over the victim. He agreed the implication was that the Petitioner was driving the car. He agreed he did not question her about the Petitioner's eye condition and said he knew she did not know about the Petitioner's macular degeneration because he spoke with her before the trial. He said that Ms. Stamper had known the Petitioner since he was a child and that she probably noticed something unusual about the Petitioner's eyes. He said, though, that she could have attributed the unusual eye appearance to the Petitioner's frequent drug use. He did not want to present testimony about the Petitioner's drug use.

10

Counsel testified that he did not ask Antoin Edwards if he heard the Petitioner say the Petitioner should run over the victim. He said, though, that the strongest evidence of premeditation was the Petitioner's leaving the scene, obtaining a gun, and returning to the scene. He said it showed the Petitioner had the intent to kill but not necessarily that the Petitioner intended to kill the victim. He said that although the Petitioner said he did not know at whom he was shooting, the Petitioner told him that he had the intent to kill when he obtained the gun.

Counsel testified that he did not present a self-defense theory because the Petitioner disengaged from the fight, returned with a gun, and shot the victim because he thought the victim was coming after him. He said that these facts did not support self-defense and that nobody else had a gun that night. He said the facts better supported a state-of-mind theory that focused on the Petitioner's agitation after being involved in a fight with multiple people.

On cross-examination, counsel testified that he had practiced law since 1992 and that he had practiced criminal law since 1997 or 1998. He agreed he was appointed to represent the Petitioner on August 24, 2006, after previous counsel was permitted to withdraw. He said previous counsel provided him with the case file, which contained research and investigation results. He said that one of the reasons he did not employ an investigator was because previous counsel had investigated and researched the case. He concluded that an investigator was unnecessary. He said previous counsel's file contained the State's discovery package. He agreed that he reviewed those documents with the Petitioner before the trial, that he provided the Petitioner a copy of the materials, and that they discussed the facts of the case many times. He said the Petitioner told him that the Petitioner had people to read the documents to him.

Counsel testified that before the trial, he and the Petitioner discussed the strategy of focusing on the Petitioner's state of mind. Although he did not recall the Petitioner's objecting to his chosen strategy, he said it would not have changed his decision. He said that the Petitioner was polite and that the Petitioner probably would have expressed his disagreement but respected counsel's decision.

Counsel testified that he received a plea offer from the State several weeks before the trial and that the Petitioner rejected it. He said that

the week before the trial, he spoke to the prosecutor again, that he negotiated nineteen years, and that the Petitioner rejected it, too. He thought that the most likely outcome at the trial was a second degree murder conviction and said that he and the Petitioner discussed his opinion and that he encouraged the Petitioner to accept the offer. He said, though, he made clear it was the Petitioner's decision whether to accept the offer.

Counsel testified that the Petitioner's recorded statement to the police was played at the trial and that the jury was provided a transcript of the statement. He agreed that by having the recording played for the jury, the Petitioner received the benefit of not being subject to cross-examination and not having unfavorable information presented. Although he did not recall discussing these benefits with the Petitioner, he recalled discussing the "pitfalls" of the Petitioner's testifying. He said that a *Momon* hearing was held during the trial and that the Petitioner decided not to testify.

Counsel testified that in his experience many witnesses testified differently from their prior statements. He agreed that he impeached Ms. Stamper with her prior recorded statement. He recalled Ms. Stamper testified at the trial that she did not remember what she told the police and that she did not remember speaking to the police other than to tell the officer the Petitioner shot the victim.

As to his lack of requesting an instruction regarding impeachment, counsel agreed the trial transcript showed that the following instruction was provided to the jury:

> Credibility of a witness: it is your job to decide what the facts of this case are. You must decide which witnesses you believe and how important you think their testimony is. You do not have to accept or reject everything a witness said. You're free to believe all, none or any part of a person's testimony.

He said that he was comfortable with the instruction and did not request a special instruction. He agreed that self-defense was not fairly raised by the proof.

Counsel testified that Antoin Edwards testified at the trial and that he did not ask Mr. Edwards about the Petitioner's statements after the victim was shot because he did not want the substance of the

statements repeated for the jury. He said he was unable to interview Mr. Edwards before the trial and was unsure what Mr. Edwards would say about the Petitioner's statements. He said that for strategic reasons, he chose not to question Mr. Edwards about the statement. He said that before the trial, he attempted to interview some of the State's witnesses by telephone, by going to their homes, and by canvassing the neighborhood where the shooting occurred.

On redirect examination, counsel testified that he thought Mr. Edwards would not speak to him before the trial but was uncertain. He said that earlier in his career, he asked a witness during a trial why he or she refused to speak to him, that he thought this would impact a juror's perception of the witness, but that he no longer asked because it never gave him the anticipated result.

The Petitioner testified that around midnight on the night of the shooting, he was sitting on the front porch of his uncle's house with Amanda Wynn, a family friend. He said that there were a couple of house parties that night and that a group of people were standing in the street in front of his uncle's house. He said that Ms. Wynn walked to a store nearby and that she was harassed by some men walking down the street. He said that Greg Scott was the only person he knew at the house party and that he yelled at Mr. Scott to walk to the Petitioner's uncle's house to discuss "the situation." He said that he knew Mr. Scott from the neighborhood, that Mr. Scott was like a brother, and that they had fought before the night of the shooting. He said that he and Mr. Scott talked and that the conversation escalated into a fight. He said that as he and Mr. Scott began fighting, three or four other men joined the fight. He said he did not know from where the men came but knew he was "hit, pulled on, pushed on" and felt something slash his shirt. He said he attempted to break away because he knew someone had a weapon. He said he was cut by the weapon. He said he broke free, ran, and, for protection, obtained a gun from his car located next door. He said that as he grabbed the gun and turned around, he saw the victim holding a box cutter and that the "gun just went off" because it was an automatic reflex. He said he only fired once to get the victim to leave him alone and denied firing the gun intentionally.

The Petitioner testified that only one person stood behind him at the time of the shooting. When asked if the victim was "coming after" him, the Petitioner said, "[H]e had to be ... when I turned around

with [the gun], he was right there on my back." He said the victim was shot in the side, not the back. He said the exit wound was on the victim's back because of the manner in which the victim turned. He said he was scared of the victim's cutting him with the box cutter. He said that the victim previously cut him slightly when his shirt was cut and that he feared another cut would have been more severe.

The Petitioner testified that after the gun fired, he dropped the gun and ran to his car and that Ms. Wynn got into the driver's seat of his car and drove them from the scene. He said that Ms. Wynn drove the car away from the victim, that the windows were down when she drove away, and that he did not say, "I should run over that Mfer." He said Ms. Wynn took him home. He said he collected his thoughts and went to the police department the next day.

The Petitioner testified that he was diagnosed with macular degeneration when he was five or six years old, which "block[ed] the front of [his] pupils." He said that he could not see well the night of the shooting and that although he could see the men's bodies during the fight, he could not see their faces. He said his vision problems were worse at night. He denied knowing anyone other than Mr. Scott. He admitted that he did not know if the victim had a weapon after he pulled out the gun but said he knew he had already been cut and thought the victim was going to cut him again.

The Petitioner testified that he wrote counsel a letter asking him to subpoena Mr. Scott, Ms. Wynn, Carmen Giles, Tameika "Meka" Reynolds, and Amanda Angland, who were present at the time of the shooting. He said he wrote these potential witnesses letters in which he discussed their testifying on his behalf at the trial. He said that he mailed the letters from the jail and that they were not returned to him. He agreed he provided each witness's address and contact information to counsel. The letters written by the Petitioner were received as exhibits. He identified a March 30, 2007 letter he wrote to Ms. Crawford, which stated that Ms. Crawford had spoken to counsel recently and asked that she remain in contact with counsel and testify at the trial. He agreed the trial date was not provided in the letter. He identified a May 17, 2007 letter he wrote to Mr. Scott, which stated that counsel and Mr. Scott had spoken recently and asked that Mr. Scott inform his employer he would need a few days off to testify at the trial. The letter told Mr. Scott that counsel would write Mr. Scott's supervisor a letter regarding any absences. He

identified an April 5, 2007 letter he wrote to Ms. Giles asking her to contact counsel. He identified a December 30, 2006 letter he wrote to Ms. Reynolds. The letter stated that counsel had spoken with her recently and that he knew she had been out of town. The Petitioner asked her to contact counsel should she leave town again. He identified a March 3, 2007 letter he wrote to Ms. Wynn, which stated that he knew she had spoken with counsel recently and that counsel would contact her one week before the trial. The letter asked her to contact counsel if she had not heard from counsel by the first of May. He identified a January 30, 2007 letter he wrote to Ms. Angland thanking her for staying in contact with counsel and for providing counsel her new contact information and asking her to continue to stay in contact with counsel.

The Petitioner identified a May 1, 2007 letter he wrote to counsel stating he wanted to ensure that counsel had subpoenaed all the witnesses, including the witnesses who were in contact with counsel constantly. The letter identified Ms. Giles, Mr. Scott, Ms. Wynn, Ms. Reynolds, Ms. Angland, and Ms. Crawford and told counsel they were witnesses to the shooting. He said that he thought some of these witnesses had moved because he had not received any responses when he attempted to have the witnesses contact post-conviction counsel.

The Petitioner testified that he spoke to counsel about self-defense after he rejected the State's final plea offer. He agreed the State offered twenty and nineteen years for pleading guilty to second degree murder. He said he thought the jurors would find he acted in self-defense if they heard his side of the story. He said his story about how the shooting occurred had never changed. He said that the police yelled and cursed at him during the interview and that the officers prevented him from telling the entire story. He said he rejected the State's offers because he believed he was provoked and was protecting himself.

The Petitioner testified that he and counsel discussed his testifying within one month of the trial date. He said counsel believed it was not in the Petitioner's best interest to testify. He decided to trust counsel and his advice because this was the Petitioner's first jury trial. He agreed he told the trial court that he understood his right to testify and that he decided not to testify based on counsel's advice. He denied knowing counsel was not going to present any witnesses

at the trial and said he thought at least one or two of the witnesses he requested counsel to subpoena would testify. He said that had he known counsel was not going to present witnesses, he would have testified at the trial.

On cross-examination, the Petitioner testified that he did not provide previous counsel with the letters he wrote to the potential witnesses because it was too early before the trial. He said his case was not set for trial until counsel was appointed. He said he learned the witnesses' addresses and telephone numbers from other people. He said he asked people to go to the witnesses' houses, knock on the doors, talk to the people who lived there, and obtain the addresses. He said he wrote the letters based on that information and relayed the information to counsel. He said that although only one letter he wrote to counsel was received as an exhibit, he wrote counsel more than once. He denied his letters to counsel contained the witnesses' addresses and telephone numbers. He said his letters asked counsel to visit him at the jail in order to provide counsel the information. He said counsel visited him at the jail three or four times in the nine months before the trial.

The Petitioner testified that he told counsel and the police officers who interviewed him the same facts. He said that although the recording of the police interview did not show that he said the box cutter cut him, he said it was unnecessary to say it because the officers saw the cut due to his not wearing a shirt. He said the box cutter and his shirt were recovered by the police before he gave his statement. He agreed he told the police that he retrieved the gun from his uncle's porch but that he testified at the post-conviction hearing that the gun was inside his car.

The Petitioner testified that after he picked up the gun and turned around, the victim turned, that they "bumped," and that he fired the gun on reflex. He said the police officers' yelling at him during the interview prevented him from thinking clearly, but he maintained his story had never changed. He agreed his statement to the police showed that he "pulled the trigger" and that he did not mention a reflex. He agreed that his statement to the police did not show that he thought the victim and the others would leave him alone if they saw the gun. He disagreed that he told the police that he "had to cycle the gun" before shooting it and that he only wanted to give the victim "a ball pinch or something, like an aggravated assault." He

said the transcript of his police interview was "altered" because the original recording contained "hollering and cursing."

The Petitioner testified that counsel recommended that he not testify at the trial because his criminal history would be addressed on cross-examination. He said later, though, that counsel never discussed his criminal history. Although he denied having previous convictions for violent crimes, he agreed he was previously convicted of statutory rape and theft valued less than $500 and served six years for a cocaine-related conviction. He denied those were serious offenses.

The Petitioner testified that counsel did not say he was unable to locate the witnesses the Petitioner wanted subpoenaed and that counsel lied when he testified to the contrary. He said that although his statement to the police said he "got rid of the gun," he dropped the gun and ran after the shooting. He denied counsel told him that his story did not support self-defense and said counsel lied when he testified that they discussed counsel's conclusions.

Gregory Scott testified that on the night of the shooting, he and the Petitioner had "a little confrontation" and that "a couple other guys jumped in it" because of issues they had with the Petitioner previously. He said the other men "took it as a good opportunity to handle . . . [their] business." He identified the other men as the victim and someone he knew only as Cornelius and said they "ganged" the Petitioner. He said that he and the Petitioner fought for about five minutes but that the victim and Cornelius continued to "gang" him. He said that the Petitioner attempted to get away from them but that the victim kept coming toward the Petitioner. He said he did not see the Petitioner leave to get a gun. He said that things happened quickly and that the fight did not end when the victim was shot. He said that he was about ten yards from the victim when he was shot but that he was walking back to his house because he was not supposed to be outside. He denied seeing what occurred from the time he walked away until the victim was shot, which was about one minute. He admitted being on probation at the time of the shooting. He said the victim and the Petitioner were face-to-face when the victim was shot.

Mr. Scott testified that although the victim was trying to "get at" the Petitioner when Mr. Scott turned to walk back to his house, people

were outside attempting to break up the fight. He said the fight occurred a few feet from where the victim was shot. He saw the Petitioner attempting to get away during the fight and the victim "going after" the Petitioner. He said that he and the Petitioner grew up together and that he knew the Petitioner had vision problems.

On cross-examination, Mr. Scott testified that he had previous convictions for theft and automobile burglary. He denied talking to counsel or anyone else before the trial about the fight and shooting. He said that he did not provide a statement to anyone because he was not asked and that he did not want to "deal with" the police if he could avoid it. He said his confrontation with the Petitioner was about a misunderstanding related to a girl. He said he stopped fighting with the Petitioner after the victim and Cornelius joined the fight. He said he returned home because he heard people talking about calling the police and did not want to be involved.

Mr. Scott testified that he did not receive a letter from the Petitioner when the Petitioner was in confinement. He read the letter addressed to him that was previously received as an exhibit and said he did not recall receiving it. He did not recall speaking with counsel but knew the Petitioner was charged with murder. He did not know anyone was looking for him before the Petitioner's trial. He said that because he looked away from the Petitioner and the victim, he would not have been able to testify at the trial about the Petitioner's obtaining a gun, walking to the porch, or shooting the victim. He said he did not have a box cutter that night and did not recall anyone else having a box cutter. He agreed he was on probation at the time of the shooting for a theft-related charge.

On redirect examination, Mr. Scott testified that although he did not want to be involved, he would have testified had he been subpoenaed to appear at the trial.

He agreed post-conviction counsel served him with a subpoena at his probation officer's office. He denied having a reason to lie and said the last thing he saw was the victim "heading toward" the Petitioner and their arguing.

The trial court found that counsel did not provide ineffective assistance and denied relief. Regarding the Petitioner's decision not to testify at the trial, the court found that counsel was not deficient.

It found that the Petitioner knew the decision to testify was his, that the Petitioner's version of the events did not change before the trial, that he did not tell counsel his statement was incomplete or inaccurate, and that the Petitioner's statement to the police was presented at the trial. The court found that the Petitioner's testifying to the same events contained in the statement to the police was "unlikely to advance the theory of the defense[.]" The court also found that counsel properly advised the Petitioner that he would have been subject to cross-examination and would have been questioned about his criminal history, which included convictions for violent offenses.

Regarding counsel's failure to present witnesses and proof at the trial, the trial court credited counsel's testimony that the Petitioner did not provide contact information for the six potential witnesses identified at the post-conviction hearing. The court found that counsel was unable to locate any witnesses, including Mr. Scott who was on probation at the time of the shooting, after visiting the neighborhood where the shooting occurred and questioning people he encountered there. The court noted that it was undisputed that counsel did not hire an investigator and stated that "in this digital age, an investigator might have done more to locate the witnesses[.]" The court noted that Mr. Scott was the only potential witness presented at the post-conviction hearing. The court found that Mr. Scott did not see what occurred in the minute leading to the shooting because he turned away and began walking home. Regarding Ms. Wynn, the court found that there was no evidence presented that her statement was favorable to the Petitioner and that any deficiency in counsel's performance was not prejudicial.

Regarding counsel's failure to cross-examine Ms. Stamper about her previous theft conviction and failure to request a special jury instruction about her credibility, the trial court found that Ms. Stamper was questioned about her prior theft conviction on direct examination and admitted pleading guilty and paying a fine, although she denied having been convicted. The court found that the jury was provided a pattern instruction on the credibility of witnesses that referred to evidence of the witness's intelligence, respectability, and reputation for truthfulness. The court found that counsel was not deficient.

Regarding counsel's failure to cross-examine Mr. Edwards about the inconsistency between his and Ms. Stamper's testimony relating to the Petitioner's threat to run over the victim, the trial court found that Mr. Edwards's testimony did not exclude the possibility that the Petitioner had driven away by the time Mr. Edwards left his home and arrived at the location where the victim fell to the ground. The court found that Mr. Edwards was inside when the argument began, that he went to a window after hearing loud voices outside, and that he saw the shooting. It found that Mr. Edwards left the window, obtained a towel, and took the towel to his aunt, who was outside. The court found that Mr. Edwards heard the victim say, "It hurt," and that "presumably, before he went to speak to his aunt and fetch a towel, he saw the [P]etitioner drive away." The court found that any deficiency in counsel's performance was not prejudicial in the absence of evidence that Mr. Edwards could or would have contradicted Ms. Stamper's testimony regarding the threat.

Regarding counsel's failure to pursue self-defense and to request a self-defense jury instruction, the trial court found that the Petitioner did not mention in his statement to the police that someone had a box cutter and that his shirt and skin were cut before the shooting, although the Petitioner said during his police interview that his wound was obvious. The court noted that the Petitioner attempted to convey the "defensive nature of his action" and that the prosecutor argued that the Petitioner raised self-defense and passion after he was apprehended. The court found that counsel argued at the trial that the Petitioner attempted to disengage from the fight and retrieved the gun after he was followed and perceived a threat. The court found counsel noted the State's experts concluded that the victim and the Petitioner were about two feet apart at the time of the shooting and were unable to determine the Petitioner's location at the time of the shooting. The court found that the Petitioner's account of the fight and shooting at the post-conviction hearing raised an issue of self-defense but that at no time before or during the trial, however, did he indicate to counsel that his statement to police, which in the opinion of the Court of Criminal Appeals, supports the theory of the prosecution of disengagement and escalation, was incomplete or inaccurate in any way and for any reason or give counsel a different account of events.

The trial court noted that the Petitioner obtained the gun from a place more than twenty yards from where the victim fell and that Ms. Stamper's and Mr. Edwards's testimony showed that at the time of the shooting, the Petitioner was within a few feet of where the victim fell. Based on this evidence, the court agreed with counsel that a "complete-justification theory seem[ed] a less-probable explanation of the facts than a provocation theory." The court stated that "although counsel did ... overlook the possibility that the [P]etitioner's intent in retrieving the gun was not to shoot someone but to deter further attack," any deficiency in this regard was not prejudicial.

Regarding counsel's failure to introduce evidence of the Petitioner's having macular degeneration, the trial court questioned counsel's conclusion that the condition was not relevant. The court noted that the prosecutor argued at the trial that the Petitioner never identified the victim as one of the assailants. The court found that although the Petitioner's eye condition could have explained his inability to identify any of the assailants, except for Mr. Scott, and his possible "misapprehension of the ongoing threat and . . . overreaction," the evidence was minimal. The court noted that no evidence existed explaining the discrepancy between the Petitioner's stating that the victim was on the Petitioner's back when he retrieved the gun and the victim's falling in the street twenty yards away. The court found that any deficiency in counsel's performance was not prejudicial.

*Tarvin v. State*, 2014 WL at *4–15.

## III.   STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), codified in 28 U.S.C. § 2254, *et. seq*., a court considering a habeas claim must defer to any decision by a state court concerning the claim, unless the state court's judgment: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1)–(2).

The § 2254(d) standard is a hard standard to satisfy. *Montgomery v. Bobby*, 654 F.3d 668, 676 (6th Cir. 2011) (noting that "§ 2254(d), as amended by AEDPA, is a purposefully demanding standard . . . 'because it was meant to be'") (quoting *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011)). Further, where findings of fact are supported by the record, they are entitled to a presumption of correctness which may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## IV.    ANALYSIS

Petitioner's § 2254 habeas corpus petition [Doc. 1] does not set forth any factual basis for his claims, but rather generally alleges ineffective assistance of counsel and error on the part of the trial court with regard to such claims [*Id.* at 9]. Specifically, other than case law citations, ground one of the petition states only that "the Tennessee Court of Criminal Appeals['] finding that trial counsel rendered effective assistance of counsel and no violation was a decision involving an unreasonable application of clearly established federal law as determined by the Supreme Court."[1] Similarly, ground three of the petition states in substance only that "[n]one of the deficiencies of counsel were the result of sound trial strategy and the trial court erred when it found the testimony of counsel sufficient" [*Id.* at 9]. As such, the petition does not comply with Rule 2(c) of the Rules Governing Section 2254 Cases, which requires a petition to both specify all grounds for relief available and state the facts supporting each ground. Rules Governing 2254 Cases, Rule 2(c)(1) and (2). Regardless, the Court liberally construes the § 2254 petition to assert the claims for ineffective assistance of counsel Petitioner raised in his brief on appeal of the denial of his petition for post-conviction relief and will therefore address it as such.

---

[1] The petition contains no claims for relief in ground two [Doc. 1 p. 7].

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. A defendant has a Sixth Amendment right not just to counsel, but to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Supreme Court set forth a two-pronged test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687. Petitioner has the burden of showing both deficient performance and prejudice. *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000).

Under the first prong of the test, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. A defendant asserting a claim of ineffective assistance must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).

The second prong requires the petitioner to show that counsel's deficient performance prejudiced the defense. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the

judgment." *Strickland*, 466 U.S. at 691.  In order to prevail on a claim of prejudice, a petitioner must show "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.  While both prongs must be established to meet a petitioner's burden, if "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.* at 697.

Review of a *Strickland* claim under § 2254(d)(1) is "doubly deferential."  *Knowles v. Mirzayance*, 556 U.S. 111, 123, 129 S.Ct. 1411, 1420 (2009).  Further, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable," but instead "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Harrington v. Richter*, 131 S.Ct. 770, 788 (2011).

The Court will address Petitioner's ineffective assistance of counsel claims from his brief appealing the denial of his petition for post-conviction relief in turn, applying the above standard.

### A.  <u>Subpoena Claim</u>

In this claim, Petitioner asserted counsel was ineffective for not finding and subpoenaing individuals that Petitioner had identified for counsel as potential witnesses [State Court Record p. 1165–69].  Specifically, Petitioner alleges he identified six witnesses to counsel he wanted to have testify at trial, but counsel did not try to contact these witnesses until May 18, 2007, three days before the trial [*Id*. at 1166–67].  One of these witnesses, Gregory Scott, testified at the post-conviction hearing [*Id.* at 1180–1103].  His testimony was that the fight between Petitioner and the other men was still occurring and that the victim was still trying to get towards Petitioner until approximately a minute before Petitioner shot the victim [*Id.* at 1087–88].  Mr. Scott had turned his back from the confrontation approximately a minute before the shot occurred, and therefore did not see what occurred during this time [*Id.* at 1087–88].  Mr. Scott did not see Petitioner get a

gun, nor did he see any weapons used during the fight [*Id.* at 1085, 1090]. None of the other individuals Petitioner had identified as witnesses testified at the post-conviction hearing, though Petitioner filed letters he stated that he had sent to them regarding the case and trial testimony [*Id.* at 839–45].

Counsel's testimony at the post-conviction hearing as to this claim was that Petitioner gave him a list of potential witnesses, but did not provide contact information [*Id.* at 908]. Accordingly, counsel and his paralegal attempted to find those people personally by canvassing the neighborhood and approaching people [*Id.* at 908–09]. Despite this effort and despite asking Petitioner to provide him with names of people who could get him in touch with the relevant individuals, however, counsel was unable to locate them [*Id.* at 909–10].

In affirming the trial court's denial of this claim for relief, the TCCA noted Petitioner had a "fundamental, constitutional right to the 'compulsory attendance of witnesses under the Sixth Amendment of the United States Constitution, and Article I, Section 9, of the Constitution of Tennessee." *Tarvin v. State*, No. E2012-01211-CCA-R3-PC, 2014 WL 259675, at *16 (Tenn. Crim. App. Jan. 22, 2014), *perm. app. denied* (Tenn. Feb. 12, 2014). The TCCA found, however, that the trial court had credited counsel's testimony Petitioner had not been able to provide him with contact information for the potential witnesses, rather than Petitioner's testimony that he had written and mailed letters to the witnesses. *Id.* The TCCA also found Petitioner's failure to present any witnesses other than Mr. Scott at the post-conviction hearing prevented Petitioner from relief for a claim that counsel was deficient for failing to locate and present that witness. *Id.* Further, the TCCA found Petitioner had not established counsel's failure to locate Mr. Scott through his probation officer had prejudiced Petitioner, as Mr. Scott's testimony was that he had walked away

from the fight and therefore did not see Petitioner walking to the porch, obtaining the gun, and shooting the victim. *Id.*

Nothing in the record suggests the state courts' denial of this claim was contrary to or an unreasonable application of clearly established federal law, or that this denial was an unreasonable determination of the facts in light of the evidence presented. Accordingly, Petitioner is not entitled to relief on this claim.

### B.  Investigator Claim

Petitioner also asserts counsel was deficient for not hiring an investigator to locate the witnesses at issue in the above claim [State Court Record p. 1169–70]. Specifically, Petitioner asserts an investigator would have at least located Mr. Scott, and likely would have located and subpoenaed other witnesses [*Id*. at 70]. Relying on the *Strickland* opinion's statement that "inquiry into counsel's conversations with the defendant may be critical to proper assessment of counsel's investigation decisions," *Strickland*, 466 U.S. at 691, counsel's attempts to find the witnesses detailed above, and the fact that counsel also relied on the investigation done by Petitioner's prior counsel, the TCCA found that counsel was not deficient for not hiring an investigator. *Id.* at 17–18.

Nothing in the record suggests the state courts' denial of this claim was contrary to or an unreasonable application of clearly established federal law, or that this denial was an unreasonable determination of the facts in light of the evidence presented. Accordingly, Petitioner is not entitled to relief on this claim.

### C.  Testimony Claim

In this claim, Petitioner asserts counsel was deficient for advising Petitioner not to testify at trial, as Petitioner wanted to offer testimony to support a theory that he acted in self- defense

and did not realize counsel was not presenting such a theory or any witnesses [State Court Record p. 1170].

The TCCA determined the post-conviction court had credited counsel's testimony that he and Petitioner had discussed whether Petitioner should testify at trial and counsel had concluded presentation of a self-defense theory was not supported by Petitioner's version of the relevant events, as Petitioner had told counsel he was involved in a fight, left the scene, returned to the scene with a weapon, and shot the victim, which was consistent with Petitioner's statement to the police. *Tarvin v. State*, 2014 WL at *18. Further, the TCCA noted counsel believed any trial testimony from Petitioner would be substantially similar to Petitioner's police statement that was played to the jury [*Id.*]. Thus, allowing that statement to be played at trial in lieu of Petitioner testifying prevented Petitioner from being subject to cross-examination as to unfavorable subjects, such as Petitioner's criminal history, that would overshadow any favorable testimony, including testimony that would allow Petitioner to "flesh out" what he had said in his police statement [*Id.*]. The TCCA further noted counsel testified that when Petitioner made the decision not to testify, Petitioner knew he could testify if he wanted to, knew the defense was not calling witnesses, and that Petitioner did not object to counsel's strategy [*Id.* at 19]. This is an accurate summary of the relevant portions of counsel's testimony at the post-conviction hearing [State Court Record p. 920–937].

Accordingly, the TCCA found that none of the evidence presented, including Petitioner's statements, supported a theory of self-defense,[2] that Petitioner avoided cross-examination as to his

---

[2] Under Tennessee law, a criminal defendant who uses deadly force must show that he had "'a reasonable belief that there is imminent danger of death or serious bodily injury'" due to danger that was real or that the defendant honestly believed was real. *State v. Hawkins*, 406 S.W.3d 121, 128 (Tenn. 2013) (quoting Tenn. Code Ann. § 39-11-611).

criminal history by not testifying, and that later changes in Petitioner's testimony likely would have further affected Petitioner's credibility. *Id.*

The Court agrees with the TCCA that, as the record establishes Petitioner's testimony would have been substantially similar to his police statement played at trial, evidence of Petitioner's criminal history would have been unfavorable if brought out on cross-examination, and any changes in Petitioner's testimony likely would have further impacted Petitioner's credibility, Petitioner has not established that counsel was deficient for advising Petitioner not to testify. Accordingly, the state courts' denial of this claim was not contrary to or an unreasonable application of clearly established federal law, nor was it an unreasonable determination of the facts in light of the evidence presented, and Petitioner is thus not entitled to relief on this claim.

### D. Impeachment and Jury Instruction Claim

In this claim, Petitioner asserts counsel was deficient for not cross-examining Lottie Stamper on her previous inconsistent statements and her prior conviction for theft and for not requesting a special jury instruction regarding this witness's credibility [State Court Record p. 1172–74]. The TCCA found this claim was without merit, as the instructions to the jury regarding judging the credibility of witnesses were adequate, Ms. Stamper had admitted to pleading guilty and paying a fine for the subject conviction on direct examination, and counsel "had highlighted the discrepancies in Ms. Stamper's testimony by playing portions of her police interview," thereby strategically focusing on the inconsistencies that were "most relevant to his theory of the case." *Id.* at 21.

The TCCA's findings with regard to this claim are consistent with the record and nothing in the record suggests the state courts' denial of this claim was contrary to or an unreasonable application of clearly established federal law, or that this denial was an unreasonable determination

of the facts in light of the evidence presented.  Accordingly, Petitioner is not entitled to relief on this claim.

### E.  Eye Condition Claim

In this claim, Petitioner asserts counsel was ineffective for not introducing proof of Petitioner's macular degeneration eye disorder [State Court Record p. 1174–76].  Petitioner asserts that this eye condition and its effects on Petitioner's vision, including the fact that Petitioner could not see other than figures and through his peripheral vision, was relevant to Petitioner's actions in shooting the victim, as Petitioner had been in a fight and the victim had been continually approaching Petitioner [*Id.* at 1175].

The TCCA found that the record demonstrated counsel did not introduce evidence of this condition because it was not helpful to obtaining a conviction for voluntary manslaughter.  *Id.*  The TCCA further noted counsel recalled the testimony at trial establishing that Petitioner thought someone that he could not identify was approaching him and fired the gun, shooting the victim in the back.  *Id.*  Further, the record showed that counsel did not introduce evidence of Petitioner's eye condition through Ms. Stamper because he was afraid that she would attribute Petitioner's eye condition to his drug use, a risk that counsel did not want to take.  *Id.*

The TCCA acknowledged that counsel could have used the eye condition to explain why "Petitioner did not have a clear head" and to support the proposition that Petitioner could not clearly see the men attacking him and therefore "misinterpreted the threat against him."  *Id.*  The TCCA held, however, that in light of the evidence in the case, including Petitioner's statement to police that he retrieved a gun and returned to the victim's location, any deficiency in counsel's performance on this issue "did not create a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different."  *Id.*

The Court agrees with the TCCA that, even assuming counsel was deficient in not introducing evidence of this eye disorder, Petitioner has not met his burden to establish that any such deficiency affected the outcome of the case. Accordingly, nothing in the record suggests the state courts' denial of this claim was contrary to or an unreasonable application of clearly established federal law, or that this denial was an unreasonable determination of the facts in light of the evidence presented. Petitioner is thus not entitled to relief on this claim.

## V.     CONCLUSION

For the reasons set forth above, the Court finds that none of Petitioner's claims warrant issuance of a writ. Therefore, Petitioner's petitions for a writ of habeas corpus [Doc. 1] will be **DENIED** and this action will be **DISMISSED.**

## VI.    CERTIFICATE OF APPEALABILITY

The Court must now consider whether to issue a certificate of appealability ("COA"), should Petitioner file a notice of appeal. Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order in a habeas proceeding only if he is issued a COA, and a COA may only be issued where a Petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). Where the court dismissed a claim on the merits, but reasonable jurists could conclude the issues raised are adequate to deserve further review, the petitioner has made a substantial showing of the denial of a constitutional right. *See Miller-El v. Cockrell*, 537 U.S. 322, 327, 336 (2003); *Slack*, 529 U.S. at 484.

After reviewing each of Petitioner's claims, the Court finds Petitioner has not made a substantial showing of the denial of a constitutional right as to any claims. Specifically, Petitioner has not shown that counsel was deficient and/or that there is a reasonable probability that, but for

any of counsel's alleged errors, the result of the trial would have been different. Accordingly, a

COA **SHALL NOT ISSUE**.

      **AN APPROPRIATE ORDER WILL ENTER.**


**/s/**_____

**CURTIS L. COLLIER**

**UNITED STATES DISTRICT JUDGE**